Good morning. Will you please record? I'm Francesca Bellini, Counsel for the United States, and I'd like to reserve three minutes of my time for you. All right. Seeking to defend a $500 million worthless stock deduction for one of its subsidiaries, Sanmina gave the IRS Evaluation Report prepared by DLA Piper. DLA Piper concluded that Sanmina's subsidiary was insolvent because its largest asset, a $113 million intercompany receivable, lacked economic substance and should be ignored. This critical determination to disregard the intercompany loan was expressly based on two memos prepared by Sanmina's in-house counsel. The IRS requested that Sanmina produce the memos and it claimed that they were both privileged. But by giving the valuation report to the IRS, Sanmina deliberately injected the content of those memos into the tax audit. This is a textbook example of using privilege as both a sword and a shield. Offering up the valuation report to defend the tax deduction but then refusing to turn over the memos on which the valuation is explicitly based. Under this court's case law, a waiver can occur in many different circumstances, two of which are relevant here. First, when a client discloses a privileged communication, the content of the privileged communication. Also, when a client intentionally relies on a privileged communication by putting it at issue in a case. Are you conceding that these communications were privileged? We are not. The government no longer disputes the threshold applicability of the privileges to the 2009 memo. We do continue to dispute that the 2006 memo was privileged. I was planning to address the waiver issue first today because it is an issue the court will have to reach to resolve the 2009 memo and it is the one issue that entirely resolves this case. But we do continue to maintain that the 2006 memo was neither protected by the attorney-client privilege or the work product privilege. Also, did the district court have the opportunity to see the memos in camera? The government asked the district court to review them in camera and it declined to do so. And I think one of the core things that, going back to the point on waiver, one of the primary contentions in this appeal is that the valuation report, and I'm looking in particular on page 36 of the exclusive record, is the key portion where the government claims that this waiver occurred. Let me give you a moment to turn there. This is, the title of the page is Net Asset Value Method and this is where DLA Piper concludes that the intercompany loan should be disregarded because it lacks economic substance. Now DLA Piper initially states on that page that it believes the book value of the liability provides the best estimate of fair market value. But then it says, rather than following that standard valuation principle, based on interviews with management and the related documents provided by management, which are the two memos that issue here, DLA Piper decides to stray from its standard valuation practice and to conclude instead that the loan should be disregarded because it lacks economic substance. Because I finally found page 36, would you identify what passage you're relying on? Sure. It is the first paragraph on that page, beginning with, We believe that the book value of each liability provides the best estimate. Then the next sentence goes on to say that DLA Piper essentially changed its mind based on interviews with management. I'm sorry, I'm looking at page 36 of the record and it is page 14 of the transcript of the hearing, I guess. What's your reference? I am looking at the excerpts of record that were filed with the government's opening brief, volume 2. Okay. It is the... I'd be happy to provide it to her with a copy that I have right here. What's the larger document? Is it the transcript? No, it is the estimate of fair market value of Sandnina International AG's Exhibit C to, I believe this was the government's reply in support of its petition to enforce the summons. Okay. Shall I proceed? Please proceed. Okay, sorry. I'm going to give you a chance to find the correct page. We contend that the waiver occurred in its paragraphs 1 and 3 on that page. Paragraph 1 is where DLA Piper concludes that the loan should be disregarded because it lacks economic substance, and it cites in footnote 6 the two memos that the government is seeking in support of that conclusion. Paragraph 3 then goes on to essentially disclose what those memos presumably say, which is that the nature of the intercompany loan was just to make the subsidiary solvent, to essentially prop up the solvency of the subsidiary for local statutory purposes, but that the company never had any intention to fund the loan, and it was its intention to book it but never pay it. Therefore, we concluded that it's appropriate to disregard the intercompany receivable as it has no real economic substance. It's the government's contention that this paragraph discloses what's essentially set forth in the 2006 and 2009 memos. Moreover, the valuation report explicitly relies on the analysis of Sanmina's in-house counsel in rendering this critical determination. So even if this valuation report did not disclose the contents, it expressly relies on analysis of counsel in reaching the critical conclusion. And even under this court's case law, even a mere reference to a privileged communication that is put directly at issue in the litigation waives the privilege. That was the situation in the Salcido case cited in our brief. That's at 607 F. 2nd 318. And this was a case in which it was a criminal case in which the defense counsel had prepared a particular transcript of a conversation between the defendant and, I think it was an informant. The court acknowledged that this transcript was privileged. It was protected by the work product privilege. But because defense counsel made reference to the transcript in its cross-examination, this court held that it waived the privilege. Now, in that case, the defense counsel did not disclose the contents of this transcript, but he made reference to it. He put it at issue in the case and put the government in the position of having to refute it, essentially. And that's what's also occurring here. Regardless of whether the content of the memos are disclosed, Sanmina has put them at issue by embracing the conclusion of DLA paper to defendant's tax returns. So you're arguing that the passage of the DLA transcript says that the company cannot selectively disclose part of the memo's content without waiving the privilege? That's right. That's right. And it's clear in this court's case law. In fact, in a 2012 decision in Ray Pacific Pictures, this court explicitly rejected the notion that a client can engage in selective waiver if the privilege decides to waive it in one context but not another. Now, this is not exactly that case. We don't have two different contexts. But the fact remains that once a waiver occurs, to many a degree, the privilege is waived with respect to that communication. Just turning to our argument also as to the threshold applicability of the privileges to the 2006 memo, under this court's case law, a document only has work product protection if it's created because of litigation. As we've argued in our brief, the 2006 memo was prepared three years before the tax deduction, an issue that was even claimed on the return. There is no evidence in this case that three years before the tax deduction was even claimed, Sandino was contemplating litigation over that deduction. With respect to the attorney-client privilege, we've also argued that there is no evidence of a privileged communication. Sandino has essentially blanketly asserted that it's a memo containing legal advice. Well, under this court's case law, there needs to be a request for legal advice and a communication back to the client. But hasn't the IRS waived that particular argument because you focused on the legal versus business advice distinction earlier, and now you're raising a different issue? We did. In the proceedings below, the focus of the government's argument was on the fact that it was business advice, but we did in our reply, and I have the supplemental excerpts of record, page 12 and 13. In our reply, we did also argue that there was no, we did raise the point that there was no specific request for legal advice, and no evidence that he shared that advice with anyone. So, while this is not exactly the focus of our argument below, we believe that we preserved this variation of the argument because we did make these particular points below. If this court has no further questions on these issues, I'll reserve the rest of my time for anybody who fears not. Thank you. Thank you. Good morning. May it please the Court. My name is Michael Beam, and I represent San Bueno Corporation. Also at the Council table is Edward Atanasio, and now is Counsel. If the Court excuses me, I'm getting used to new lessons. I'm taking it more hard to stand on. I didn't hear a lot of argument on the initial issue of whether the privilege is applied at these times, and so I will skip directly to the way of our arguments, since it seems like that's where the government's focusing its fire. Although I will return to the initial privilege issues at some point, if I have the opportunity. The issue before the Court as the government has framed it seems to be the following. Tamina disclosed in part the content of these attorney memos, and therefore they have to disclose the entirety of the current attorney memos. In fact, Tamina did not disclose any part of the content of the attorney memos. Nowhere in the DLA paper report, including page 36 of the Assertion Record 22 by the government, is there a word about what those memos say. But does there have to be? Isn't the description under our case law the reference, implicit or otherwise, to those memos sufficient to waive the attorney-client privilege? No, there has to be some actual disclosure of the content of the published materials in order for there to be a waiver. In fact, the government relies largely on the Ritchie case, which I think you mentioned during the argument here. But the Ritchie case involved a case in which the tax case, just like this case, and the taxpayer submitted an appraisal report to support the tax return. And the government argued that the entirety of the appraiser's file was there for fair game, for disclosure, because the appraisal report must have been compiled to support the appraisal. The government won that case, but the court's decision was to remand the case for further proceedings so that the individual contents of that file could be examined to determine whether it contained privileged materials. Well, do you think that might be a possible outcome in this case, that we remand for the district court to actually examine the challenged memos to see if, in fact, the privilege was waived? I don't think that the content of the memos is going to disclose whether the privilege was waived. I think there's really no dispute about what the subject matter of those memos is. That subject matter of those memos is disclosed in the footnote. It's simply that the content of the memos is not disclosed. Well, how do you know that unless the district court looks at them to see whether or not there was anything in the information that was disclosed that mirrors what's in the memos? We're supposed to take your word for it. It was disclosed. No, Your Honor. I'm not at all. What I'm asking the court to do is to look at the DLI Diver report. Nowhere does that report purport to disclose anything that the memos contain. Counsel, I'm looking at the passage that the opposing counsel raised, and you've pointed to as well. And it said, We concluded that the intercompany loan between Sanmina and So-and-so, as well as the intercompany non-trade receivable between Sanmina and Sanmina AG, $113 million, should be disregarded. And then there's a reference to the document in footnote 6. Isn't that a disclosure? No, I don't believe so, Your Honor. First of all, there are three documents mentioned in footnote 6. Only two of them are the subject of a privileged claim. The other is the actual document that is the transactional document, which is the capital contribution agreement from which that conclusion by itself can be reached. In fact, going back through the history here, and this is all in the court's record, Sanmina provided the IRS with all of the transactional documents on which the DLA Piper conclusion was based. Are any of those in footnote 6? One of them is. The others are not. But all of them were provided in response to a request by the Internal Revenue Service. I can't give the court the exact page number, but it is in the record. It's part of Mary Beth Bautista's declaration. Every single transactional document that went into these transactions that led DLA Piper to its conclusion, every single one of those documents was provided to the service. What was not provided to the service was the attorney analysis of those materials. Which document is that? Is that referred to on page 56? I'm sorry. I'm not missing anything. Well, I'm looking at footnote 6, and I think that's the key argument that the government is making, that the reference to the capital contribution agreement is enough to suggest that it be disclosed. The capital contribution agreement was disclosed. Which is the one we're talking about? The two men was the first and the third. Oh, the first is dated March 11, 2009. Correct. Okay, that's the 2009 memo. Okay. So the other one, then, is the 2007 guarantee and capital contribution agreement concerning so forth. So in other words, what happened here is there were a series of documents that were provided to implement these transactions. Every single one of them is actually in this court's record. Every one of them was provided to the Internal Revenue Service. It's attached as an exhibit to the Declaration of Merit by the people of Houston. They have, the government has, every single piece of paper that formulated the transactions that led DLA Piper to conclude that those transactions should be disregarded for determining the value of the subsidiary. What the government doesn't have is the attorney's analysis of how those documents might be treated by the Internal Revenue Service. And they're not entitled to that. And the fact that those documents were provided to DLA Piper, whom is undisputed and is providing both tax advice and legal advice, doesn't disclose their contents or waive the privilege. Counsel, may I ask you what's your strongest case to support your argument that reference to a document is sufficient to constitute a waiver, that the content of the document must be disclosed? I would go back to the Ritchie case on which the government chiefly applies. In the Ritchie case, which the government won, and if the court will indulge me for a moment, I'll talk about the case. In the Ritchie case, the taxpayer prepared an appraisal report. The appraisal report was submitted to the government to support a charitable tax write-off. The government demanded the production of the appraiser's actual files. The taxpayer resisted that, objected, and claimed that the content of the files was protected by the attorney-client privilege and the attorney-work-product doctrine. The court rejected that argument. The court said that just because the appraiser was working for the lawyer doesn't mean that the content of his files are privileged. I'm looking for a more precise answer to the question. He said that merely referencing the memos is not enough to trigger a waiver. So I'm asking you, what precise language in United States v. Ritchie are you relying on to support the proposition that reference to the memo was not sufficient to constitute a waiver? It had to be disclosure of the actual content of the memo. What language is in there that supports that argument? I'm really referring, Your Honor, to the holding and not any specific language, because if the court's ruling were that the appraiser's reliance upon We're not talking about the appraiser in Ritchie. We're talking about Santina's reference in the inclusion of these memos in the document that was provided in reference to those memos. So that's my question. Why isn't the reference to those memos sufficient to constitute a waiver? Because the content of the memos wasn't disclosed, and there's no case that I'm aware of, Your Honor, that simply says stating that a document exists means that it's not just stating that a document exists. Rely on that document and refer to it as support for the conclusions that are reached. The appraisers, I'm sorry, the DLA paper did not say that they were relying upon a document to formulate their conclusions. They said that they reviewed it, and they came to their own conclusions. It did not say that they relied upon the documents taken literally. There's nothing on this page, and it's the correct page to look at what it says. However, based on interviews with management and related documents provided by management references footnote 6, which includes the two memos, we concluded that. Correct me if I'm wrong. He's awfully close. I agree. It gets closer, Your Honor, but it does not disclose the content of the memo, and it's very clear. That's a great question. Yes, the content of the memo had to be disclosed. I mean, in order for the waiver to occur, or is the reference to and reliance upon those memos enough? I haven't gotten an answer to my question as to what case supports the argument that that's not enough to constitute a waiver. I guess I have to ask the question of the negative, which is that I'm not aware of any case supporting the notion that simply because a report references the existence of documents, that that in itself waives the privilege as to those documents. Well, both the counsel referenced a case that seems to say the opposite. There's a reference to a reliance on a document that's sufficient to support the waiver. The Saucedo case involves a situation where the lawyer actually made reference to a transcript and used it affirmatively to at least imply what its contents were and to imply that it would be used to impeach other testimony. That's not what was going on here. Nobody is saying what's in these memos. The memos could very well not reflect at all the opinion that DLA Piper reached. The issue here is you have two lawyers who are reaching legal conclusions based upon their own analyses, and no part of their analysis is being disclosed in this memo. No part of it is being disclosed. Nowhere does this, and we don't know this because the judge did not have a chance to review those documents in Cameron. The judge opted not to review the documents in Cameron. That's correct, because I don't want to speak for Master Judge Grewal, but I believe his view was because nothing was disclosed about the contents of the memos, he didn't need to review them in Cameron to determine whether any part of it, any part of those memos was disclosed. In which privilege are you relying on for the 2006 and 2009 memos? Is it the same for both, or is it a different privilege for each? It's the same for both, and as to the 2009 memos, the government concedes that they're both, they're privileged to both court product and under the attorney-client privilege, and for reasons that escape me, they draw a distinction between the 2009 memo and the 2006 memo, and argue that the 2006 memo is not protected by the attorney-client privilege. It is not protected by the court product doctrine. Even both of them analytically are the same. Both of them are lawyers by in-house tax, I'm sorry, memos by in-house tax department lawyers, analyzing transactions written to a file to give the government its due. So what the government seems to say about the 2006 memo is it may not constitute communication with counsel because it was written to file, not an argument that they raised below, but at any rate an argument that they can easily be disposed of, because when an in-house lawyer writes a memo to the file, the in-house lawyer is communicating to his client. That's who owns the file. It's not a situation where it's some outside lawyer writing a memo to a file that never gets used. So the court product argument that the government is making, I don't really understand. There is, of course, this line of cases that the government points to, and it was really the focus of the briefing on what's called dual-purpose documents under the Adeline line of cases, and the government argued that these memos may well just constitute business advice, and as Magistrate Judge Brewall said, it's hard to believe that they constitute business advice because they're written after the fact. They're written in contemplation of the likelihood of an IRS audit, and it would be more reality to believe that this transaction, the set of transactions wouldn't be audited when they triggered a $500 million tax deduction. Would that be true of the 2006 memo that they put into the court three years later? Yes, but the transactions that were relevant to that 2009 write-off occurred, almost all of them occurred prior to the writing of the 2006 memo. But didn't the memo say it was found? It wasn't discovered for a period of time? How is it created in anticipation of litigation if it's set in a file? Well, those are not, I believe, I don't view those as two separate issues, Your Honor. The fact surrounding the preparation of that memo is they were written by a lawyer who was leaving the company because he was organizing his affairs. But the memo is specifically an analysis of these documents from a tax perspective and how they should be treated from a tax perspective. And the fact that they are removed in time from the actual audit doesn't change the fact that there's no reason to write this memo unless there's some anticipation of litigation. And that's... You can just finish up. You've exceeded your time. Okay. Thank you, Your Honor. Oh, I apologize. A lot of cases, you know, starts with all the enhancements, but it makes it very clear that even if there's a business purpose to the preparation of the memo, as long as there's some anticipation of litigation, the document is privileged. And I'd like to just close with a quote from the Second Certainty Succession in U.S. v. Schaeffler. That case was cited below when the district court had issued its decision in favor of the IRS, it was since reversed, and the court wrote the following. The size of the transaction and the complexity and ambiguity of the appropriate tax treatment are important variables that govern the probability of the IRS's heightened scrutiny and in the likelihood of litigation to imagine such transaction that lacks the anticipation of litigation causes a factual scenario in odd to its reality. All right. Thank you, counsel. Thank you. You're welcome. Thank you. Counsel, what's troubling me is this Barrow issue of disclosure. What is it in that passage of the DOA Piper Report that we've been focusing on all this time reveals the content of the 2006 or 2009 memo? In terms of content, I think as your honors pointed out, of course, we're making the best guess we can because we haven't seen the memos. The district court didn't see them. Yeah, but you're relying on a theory that gives you compelled disclosure of those memos because of something on page 56. Try to pin down precisely what is that. Okay. Well, I was about to get up and explain that you don't need the content. It doesn't have to be disclosed. There would be a waiver, but I will address the content point first. We, here, DOA Piper initially states that normally the book value of the liability provides the best estimate of its fair market value. That's a standard principle of valuation. It then says, based on dot, dot, dot, documents provided by management, these two memos, we concluded that the loan should be disregarded. I'm skipping over password assertion. It then skips down, and it explains that reasoning, and we believe that in explaining that reasoning, it is getting to the content of these two memos. That's where that is. It's on the other hand. Right, in paragraph 3. And essentially what the report explains there is that even though CFBA made these intercompany loans, it essentially did these as paper transactions, essentially fictitious loans with no intention to ever pay them or fund them. It did them just to avoid being determined, an insolvency determination under Swiss law, and because there was no intention to ever pay these loans that they put on their books, they should be disregarded. Now, as Samian has explained, the 2006 memo relates to the decision to make this intercompany loan. So presumably it may explain Samian's intentions at the time. Why did it create these loans that it had no intention to fund? So we believe that this likely does disclose the content. However, as Judge Rollins said. It's likely that that troubles me. I'm not convinced that, so far at least,  or even kind of a teaser of what the content of these memos is. Well, I think in the declaration that was filed by Mary Beth Bautista, she says, at least with respect to the 2006 memo, that it explains the reasons for entering into the intercompany agreements. If that's the case, then this report discloses what those reasons were to avoid an insolvency. So some aspect of that memo has been disclosed here. So when you say it's likely that it was disclosed, and you haven't seen those memos, and the lower court didn't review the memos. Correct. Wouldn't it be appropriate to remand the case to the lower court to review the memos and make that determination? That is one option. However, under this court's case law, the fact that they are explicitly, the fact that D. L. A. Piper and Interim Sandina have explicitly relied on these memos is enough for there to be a waiver. There doesn't need to be a disclosure of the content. What's your estimation of that point? Well, I mentioned the Salcino case when I was up here earlier. I'd also like to mention the Chevron case. This is cited in our brief. That's 974 F. 2nd 1156. And the pertinent discussion is at pages 1162 to 1163. And in that case, I don't remember if it was Chevron or Pennzoil, one of the two. One, there was just reference made to we took these actions, we're making this investment for a tax deferral following our advice of counsel. There was no disclosure of what that advice was. But the company had placed at issue its tax advice. And this court held that that was enough to waive the privilege with respect to the tax advice. There was no disclosure of the content of the tax advice, but they pointed at issue. Also, the U.S. v. Nobles case, this is also cited in our brief. That's a Supreme Court case, and the site for that is 442 U.S. 225. And that was also a case where defense counsel made reference to a privileged investigator's report. And the court held that by making reference to the report in his cross-examination, he had to turn over the relevant portions to the government. I see that I've run out of my time. Unless you have any further questions. 442 U.S. 225. Oh, the page number. I'm going to need to grab the case. It does seem like in that case that there was the investigator's testimony. And they were talking about that. I'm not sure that's available. If you don't have it right there, I'll find it. Thank you, counsel. Okay. Oh, yes. The case just argued to be submitted for decision by the court.
judges: O'scannlain, Rawlinson, Watters